UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                    Criminal No. 05-237 (MJD/FLN)

       Plaintiff,

       v.                                    **REPORT AND RECOMMENDATION**

Allen Lane Cain,

       Defendant.

_____

Ericka R. Mozangue, Nathan Petterson,
Assistant United States Attorneys, for the United States.

Jordan Kushner, Esq., for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on August 24, 2005, and again on September 21, 2005, on Defendant's Motions to Suppress Witness Identifications [#18] and to Suppress Evidence as a Result of Search and Seizure [#31]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons that follow, this Court recommends Defendant's Motions be denied.

## I. FINDINGS OF FACT

### A.    Introduction

Defendant Allen Lane Cain has been charged with Armed Bank Robbery, in violation of 18 U.S.C. sections 2113(a) and 2113(d). See Indictment [#11]. The Government alleges that on June 27, 2005, Defendant robbed the Twin Cities Federal National Bank (TCF) in Fridley, Minnesota. During the investigation, authorities obtained two witness identifications of Defendant, and

recovered evidence during a search of Defendant's residence.  Defendant moves to suppress the identifications and evidence seized.

During the motion hearing on August 24, 2005, the Court heard testimony from FBI Special Agents Daniel Otterson and Michael Lawrence.  After the hearing, the parties submitted memoranda, in which they requested the evidentiary record be reopened.  The Court granted the requests to reopen, and on September 21, 2005, heard additional testimony from Government witnesses Chad Calvin and Ryan Esau, and FBI Special Agents Terrence Hill, Lisa Hill, and Lisa Nielsen, and from Defense witness Tamica Bazinet.  The parties submitted additional post-hearing memoranda on September 26, 2005.

### B.    Witness Identifications

#### 1.    Agent Otterson

FBI Special Agent Daniel Otterson testified on August 24, 2005, regarding the photo spread he showed two witnesses – Ryan Esau and Chad Calvin.  On June 29, 2005, two days after the alleged robbery, Agent Otterson and a Fridley Police Officer showed a copy of a six-person lineup to Esau, the victim teller.  See Govt. Ex. 3, Photo Lineup.  Esau viewed the lineup at the Fridley Police Department.  Agent Otterson instructed Esau that he was not required to identify anyone. After viewing the lineup for a couple of minutes, Esau identified the person in photo number two as the person who robbed the bank.  See Govt. Ex. 1, Lineup with Esau Initials.

Agent Otterson testified that he and the Fridley Officer also showed the same photo spread to Chad Calvin, a TCF employee who was present during the robbery on June 27.  He testified that they showed the spread to Calvin at the bank on June 29.  He stated that he told Calvin that they had developed a spread of possible suspects, and that he made no suggestion whom Calvin should

identify.  After viewing the spread, Calvin initialed photo number two and said he was 75% sure that the person shown in that photo was the person who robbed the bank.  See Govt. Ex. 2, Lineup with Calvin Initials.

On cross-examination, Agent Otterson noted that the background of photo number two, the one Esau and Calvin identified, was noticeably darker than the backgrounds of the other five pictures.  He testified that the Hennepin County Sheriff's Office had developed the spread using a computer program.  He also stated that he showed the spread to a third witness who did not identify anyone in the photos.

### 2.    Chad Calvin

Chad Calvin testified on September 21, 2005.  He stated that at the time of the robbery he was the TCF Branch Manager and was present at the bank when the robbery occurred on June 27. Calvin stated he remembered walking into the customer service area from the backroom when he saw a man push a customer and pull out a weapon.  Calvin heard the man say, "Quick!  Quick! Quick!  Give me the money."  He stated he had an unobstructed view of the robber from about seven feet away.  He stated that he saw the robber for a few seconds before he turned and walked to the backroom to activate the security alarm.  He continued to watch the robbery for approximately ten to fifteen seconds through the surveillance cameras that displayed the teller line.  He estimated the robber was in the bank for approximately thirty seconds.  When the police arrived, Calvin described the robber as African American, about six feet, two inches tall, with large hands and lips.  He told them that the robber wore a black windbreaker with a blue scrub shirt underneath, and dark sunglasses.

Calvin testified that he identified the robber in the photo spread shown to him on June 29. He stated that Agent Otterson told him that he should not identify a person unless he was sure that the person committed the robbery. He identified the person in photo number two, but continued to view the spread for approximately ten to fifteen minutes. He said that he did not notice at first that the background color of photo number two was different than the other backgrounds. He stated that he was fairly certain that the person in photo number two had committed the robbery. When asked to quantify his certainty, he stated he was 75 percent certain.

### 3.    Ryan Esau

On September 21, 2005, Ryan Esau testified that he was working as a sales associate at the Fridley TCF during the robbery. He stated that on the morning of June 27, while he was in his teller station, he watched a man walk into the bank and push a woman out of the teller window. The man put a gun on the counter in front of Esau and demanded cash. Esau had an unobstructed view of the robber from approximately two feet away. Esau admitted he was frightened and that his attention was drawn to the gun and to taking the money from his drawer. He estimated that the robber was in the bank about ten to fifteen seconds. He told police later that day that the robber was an African American male, about six feet tall with a large build and large lips, and that he wore sunglasses.

On June 29, Agent Otterson showed him the six-person photo spread and told him not to identify anyone unless he was certain that person committed the robbery. He stated that he viewed the lineup for approximately one minute before he identified the person in photo number two, and that he was one hundred percent sure of the identification. He noticed that photo number two had a different background color than the other photos, but stated that nothing about the background caused him to choose photo number two.

**C.    Search of Defendant's Residence**

**1.    Agent Lawrence**

FBI Special Agent Michael Lawrence testified on August 24, 2005, regarding the search of Defendant's residence. He stated that on June 29, 2005, he had received information that Defendant, a possible suspect in the robbery, lived at a home in St. Louis Park, Minnesota. Agent Lawrence went to the home, with three other agents, to surveil the residence. While outside the residence, the agents saw people exit the home and get into a vehicle. The agents converged on the vehicle and the passengers told them that Defendant was in the house.

The agents, without an arrest warrant, entered the house and arrested Defendant. Agent Lawrence stated that he did not know if anything was seized from Defendant's person during the search incident to arrest. Defendant did not consent to a search of the house. Agent Lawrence testified that two agents transported Defendant to jail, while he and the other two agents secured the house until a search warrant was obtained. See Govt. Ex. 4, Search Warrant. Agent Lawrence stated that while he and the other agent awaited the warrant, they stood outside and in the front room of the house, and that they did not search the house until the search warrant arrived. The agents were at the house approximately three hours before the warrant arrived. Agent Lawrence stated that he executed the warrant once it was obtained, and seized scrubs from the washing machine in the basement, miscellaneous receipts, and a TCF checkbook.

Agent Lawrence stated that the Affidavit attached to the Warrant did not mention scrubs, receipts or the checkbook. He stated that he seized the scrubs based on the bank surveillance photos of Defendant, in which he was wearing scrubs.

### 2.  Agent T. Hill

On September 21, 2005, FBI Special Agent Terrence Hill testified regarding the arrest of Defendant and the search of his residence.  He stated that he participated in the surveillance of Defendant's residence.  After they verified that Defendant was inside, Agent Hill followed another agent into the house to arrest him.  He stated that he knew the agents did not have an arrest warrant. After the arrest, he and Agent Lawrence conducted a protective sweep of the residence, including the basement.  He testified that during a protective sweep, agents look anywhere a person may hide to secure the residence.  He stated that he followed Agent Lawrence downstairs, after approximately one minute, and followed Agent Lawrence through the rooms.  Agent Hill stated that he did not open drawers or the washing machine and that he did not observe Agent Lawrence search in drawers or the washer during the protective sweep.

After the sweep, Agent T. Hill left the residence to transport Defendant into custody.  He estimated that he was in the house approximately twenty minutes.  Agents Lawrence and Lisa Hill stayed to secure the residence.  Agent T. Hill returned to the residence before the search warrant was obtained.  He stated that he mostly waited outside and that he never went downstairs.  He stated that after awhile, FBI Agent Lisa Nielsen arrived at the house with the search warrant, but that the agents had executed the warrant before she arrived.  He stated that he believed FBI Agent Applebaum had brought the warrant to the residence before Agent Nielsen arrived.

### 3.  Agent Lisa Hill

On September 21, 2005, Special Agent Lisa Hill testified regarding the arrest of Defendant and search of his residence.  She stated that on June 27, she entered the house while Defendant was being arrested, and remained at the residence, with Agent Lawrence, after Defendant was

transported into custody.  She testified that while she waited she phoned Agent Nielsen, the Case Agent, and told her that they had arrested Defendant.  Agent Hill believed that once Agent Nielsen heard about the arrest, she decided to obtain a search warrant of the residence.  She stated that during the conversation she told Agent Nielsen nothing regarding the observations of the residence.

She said that while she waited for the search warrant, she stayed outside and within two to three feet of the entrance to the house.  She said she entered the house to ensure no evidence was being destroyed, but that she did not go downstairs.  During the hours she waited she said that there were four or five residents of the house present, including Tamica Bazinet and her mother, who was the owner of the house.

She estimated that the agents first arrived at the residence around 11:00 a.m., and that Agent Applebaum arrived with a search kit and the search warrant Affidavit around 4:00 or 4:30 p.m.  The kit included surveillance photos of the Defendant.  Agent Hill did not believe the actual signed search warrant was on the property at the time the agents searched.

### 4.    Agent Lisa Nielsen

Lisa Nielsen testified on September 21, 2005, regarding the arrest and search of Defendant's residence.  She stated she was the Case Agent on the case.  She stated that Defendant was arrested before she obtained an arrest warrant, but that when she learned that two witnesses had identified Defendant from the photo spreads, she had called an Assistant United States Attorney, who authorized a probable cause pick-up of the Defendant.

She testified that she obtained the Search Warrant to search Defendant's residence, and the Arrest Warrant to arrest him, at 3:50 p.m. on June 29, 2005, the day the search was executed.  See Govt. Ex. 4; Govt. Ex. 5, Arrest Warrant.  She stated that she attempted to obtain the Search Warrant

throughout the day after she learned of Defendant's arrest, but that the signing magistrate had been unavailable until that afternoon.  She said that she had conversations throughout the day with the agents who were monitoring the residence, but that the conversations were generally limited to the status of the search warrant.  She said she never learned of the agents' observations of the residence, and that she incorporated no such observations into the Affidavit she submitted in support of the warrant.

Agent Nielsen stated that she had compiled the list of items to be seized that she submitted in support of the Search Warrant.  The list included a black bandana, a fishing hat, blue jean shorts, white tennis shoes, and a black windbreaker with white stripes.  On cross-examination, Agent Nielsen admitted that there was nothing in the Affidavit that referred to any of these items.  She stated that at the time she submitted the Affidavit, she suspected Defendant was involved in five other bank robberies.  She stated that the list of clothing to be seized included the clothing worn in those previous robberies.  The Affidavit she submitted contained information regarding a robbery that had occurred at a US Bank on June 25, 2005, in which the suspect was thought to have worn a gray t-shirt and black shorts, but the Affidavit contained no other information regarding previous robberies.  She stated that the list of items to be seized did not mention medical scrubs.

Once she received the signed Search Warrant, Agent Nielsen faxed a copy to Agent Applebaum and called Agent Kaufman, who was at the residence, to tell him that she received the signed Warrant.  When Agent Nielsen arrived at the residence approximately one hour after receiving the warrant, the agents had completed the search.  She stated that though she had intended Agent Applebaum to include the faxed copy of the warrant in the search kit, she was unsure whether a copy of the search warrant was in fact on the property before she arrived.

### 5.    Tamica Bazinet

Tamica Bazinet testified for the Defense on September 21, 2005, regarding the search of the St. Louis Park residence.  She stated that she was 23 years old and that on June 29, she was living at the residence, which was owned by her mother.  She stated that the Defendant was her mother's fiancé, and that he was also living at the residence in June 2005.

She testified that on the day in question she and her mother left the house for approximately fifteen minutes.  When they returned, two FBI agents were standing on the porch and the Defendant had been arrested and taken from the home.  She said that later three more agents arrived.  They told her that they were waiting to obtain a search warrant.  While they waited, the people in the house were allowed to move about freely.

At approximately 3:30 or 4:00 that afternoon, the agents began searching Defendant's room in the basement.  Bazinet stated that the agents finished searching at approximately 4:00 or 4:30 p.m., and that Agent Nielsen arrived at the home about one or two hours after the search.  She said that she never saw the actual search warrant on June 29, 2005.  She said that when Agent Nielsen arrived, she spoke to her mother and gave her some paperwork.  She heard Agent Nielsen say that she was presenting a Search Warrant.

### D.    Defendant's Motions

Defendant moves to suppress the witness identifications.  He claims the photo spread was unduly suggestive and that the identifications are inadmissible as a result.  He also moves to suppress the evidence seized during the search of Defendant's residence.  He claims the evidence should be suppressed because 1) the search was tainted by the agents' unlawful entry into Defendant's residence and the subsequent unlawful arrest; 2) the search warrant was unlawful on

its face because it authorized seizure of items that were not supported by probable cause; 3) the agents seized items that were not authorized by the search warrant; and 4) because the agents unlawfully searched Defendant's residence before obtaining the search warrant.  The Government argues that the photo spread was not unduly suggestive, and that the evidence it intends to offer, the scrubs recovered from Defendant's residence, were properly seized pursuant to the search warrant.[1] For the reasons explained below, the Court finds that the identifications and evidence are admissible, and that Defendant's Motions should be denied.

## II.   CONCLUSIONS OF LAW

### A.     The Photo Identifications Are Admissible

Defendant moves to suppress the two witness' identifications.   He asserts that the identification should be suppressed as unduly suggestive because the picture of Defendant is different than the other five pictures.   Specifically, he argues that the identifications should be suppressed because the photograph of Defendant, photo number two, is noticeably darker than the other photos and because Defendant is much shorter than the men in the other photos.

The Fifth Amendment Due Process Clause prohibits identification testimony that is derived from impermissibly suggestive procedures that might lead to an irreparably mistaken identification. See Neil v. Biggers, 409 U.S. 188, 196-98 (1972); United States v. Johnson, 540 F.2d 954 (8th Cir. 1976).  Because "[i]t is the likelihood of misidentification [that] violates a defendant's right to due process," courts must focus on the reliability of the identification.   See Biggers, 409 U.S. at 198. A due process challenge to the use of an identification requires a two-step inquiry: (1) whether the

---

[1]

In its Post-Hearing Memorandum, the Government explained that it intended to offer only the medical scrubs seized during the execution of the warrant, and that it therefore would not address the admissibility of the other evidence seized.

challenged confrontation was "impermissibly suggestive;" and (2) if so, whether the identification was nonetheless reliable under the totality of the circumstances, despite any suggestive or inappropriate identification techniques.  See Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984); United States v. Briley, 726 F.2d 1301, 1306 (8th Cir. 1984).

Here, the Court concludes that the photo spread itself was impermissibly suggestive.  The photo of Defendant is markedly different than the other photos.  The background of the picture is much darker than the other backgrounds and Defendant is much shorter than the other men pictured. Even though all men pictured were African Americans with similar complexions and hair, the Court concludes that the background of Defendant's picture and Defendant's stature render the spread unduly suggestive.

Even if an identification is unduly suggestive, it may nonetheless be admissible if the identification was otherwise reliable.  "The linchpin of due process in identification procedures is reliability, not suggestiveness."  Clark v. Caspari, 274 F.3d 507 (8th Cir. 2002).  After finding that the identification was unduly suggestive, a court must look to the totality of the circumstances to decide whether the situation created a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (cited in United States v. Lank, 108 F.3d 860, 862 (8th Cir. 1997).  In assessing reliability in the totality of the circumstances, the Court is to look at the following factors:

1.   The opportunity of the witness to view the criminal at the time of the crime;
2.   The witness' degree of attention;
3.   The accuracy of the witness' prior description of the criminal;
4.   The level of certainty demonstrated by the witness at the confrontation; and
5.   The length of time between the crime and the confrontation.

See Biggers, 409 U.S. at 199-200.  Against these factors the Court must then weigh the corrupting

effect of the identification itself.  See Brathwaite, 432 U.S. at 114; Graham, 728 F.2d at 1542.

Applying the factors outlined in Biggers, the Court concludes that the two identifications of Defendant are reliable.  Both witnesses viewed Defendant at the time of the crime.  Calvin testified that he observed Defendant walk into the bank, and although Calvin almost immediately walked out of the room, he continued to watch the robbery from the surveillance cameras.  Esau testified that he was the victim teller and was within two feet of Defendant throughout the commission of the robbery.  Although Esau's attention was understandably on the gun and on retrieving the money, he was in very close proximity to Defendant.

Both witnesses' descriptions were detailed and fairly accurate for the characteristics they were able to see.  Both reported to police on the day of the robbery that the suspect was a tall African American male with large lips and that he wore sunglasses.  Calvin accurately described the clothes Defendant wore, including the scrub shirt that was later seized from Defendant's residence. Esau testified that he was one hundred percent certain of his identification; Calvin testified he was seventy-five percent certain.  Only two days passed between the robbery and the identification procedure, and the short period of time suggests the identifications were reliable.

In weighing the corrupting effect of the suggestive photo spread against the above factors, the Court concludes that the identifications were reliable, and that there is not a "very substantial likelihood of irreparable misidentification."  See Brathwaite, 432 U.S. at 114.  The totality of the circumstances suggest that the identifications were reliable and that Defendant's due process rights were not violated.  Defendant's motion to suppress the identifications should be denied.

B.     **The Search Was Not Tainted and the Evidence Should Not Be Suppressed as a Result of the Agents' Illegal Entry and Arrest**

1.     **No Evidence Was Obtained from the Illegal Entry and Arrest**

Defendant argues that the FBI agents improperly entered his residence and arrested him, and that as a result, the evidence seized should be inadmissible.  It is undisputed that the agents did not have a warrant for Defendant's arrest at the time they entered his house on June 29.  The Fourth Amendment prohibits a warrantless entry into a suspect's home to make a routine felony arrest absent consent or exigent circumstances.  Rogers v. Carter, 133 F.3d 1114, 1118 (8th Cir.1998); see also, Steagald v. United States, 451 U.S. 204 (1981) (in the absence of consent or exigent circumstances, an officer may not search for a suspect in a third party's home without first obtaining a search warrant); and Payton v. New York, 445 U.S. 573, 588-90 (1980) (absent exigent circumstances, the threshold of a home may not reasonably be crossed without a warrant).  Under the exigent circumstances exception, the warrant requirement is suspended "when – in the press of circumstances beyond a police officer's control – lives are threatened, a suspect's escape looms, or evidence is about to be destroyed."  United States v. Duchi, 906 F.2d 1278, 1282 (8th Cir. 1990) (citations omitted).

Here, the Government offered no evidence of any exception to the warrant requirement, and does not appear to dispute that the entry was improper.  Consequently, the exclusionary rule would apply to bar the admission of any evidence obtained from the warrantless search.  See Mapp v. Ohio, 367 U.S. 643, 648 (1961) (citation omitted); Weeks v. United States, 232 U.S. 383, 398 (1914).  It appears, however, that the agents seized no evidence tainted by the illegal entry.  The agents recovered no evidence from Defendant's person during the search incident to arrest, or from the residence during the protective sweep.  Thus, because no evidence seized was tainted by the illegal

entry, no evidence need be suppressed.  See United States v. Beck, 662 F.2d 527 (8th Cir.1981)

(where search independent of initial warrantless entry, fruits of search need not be suppressed).

### 2. The Evidence Recovered Is Admissible Pursuant to the Independent Source Doctrine

Instead, the evidence seized and sought to be admitted was seized through activities

untainted by the illegal entry and is admissible under the independent source doctrine.  See Murray

v. United States, 487 U.S. 533 (1988).  In Murray, a search warrant was obtained after an illegal

entry.  The Supreme Court held that the evidence seized during the warrant search was admissible

if the search warrant was the product of independent sources of information, rather than information

obtained during the illegal entry.  That question turned on whether the agents' decision to seek the

warrant was prompted by what they had seen during the illegal entry, and whether information

obtained during that entry was presented to the Magistrate and affected her decision to issue the

warrant.  Id. at 542.

Here, the Case Agent who decided to seek the warrant was not present at the residence

during the illegal entry.  Agent Nielsen's decision to seek the warrant was not prompted by any

evidence viewed during the illegal entry.  The agents testified that they completed a protective

sweep of the residence, but uncovered no evidence during the sweep or while they were waiting for

the warrant to arrive.  They testified that they never conveyed any observations regarding the

residence or evidence within to Case Agent Nielsen before she obtained the warrant.

With respect to the second independent source issue, it is undisputed that any information

obtained by the agents during their illegal entry was not presented to the Magistrate and thus did not

affect her decision to issue the warrant.  Agent Nielsen included no information regarding the

residence or Defendant's arrest in her application for the search warrant.

-14-

Based on the information that the agents had gathered during the two days after the robbery and before the illegal entry, it is reasonable to assume that Case Agent Nielsen, a veteran law enforcement officer, would have sought a warrant to search Defendant's house, regardless of the illegal entry.  At the time of the entry, agents had obtained two witness identifications of Defendant and information regarding his place of residence.  Once the agents had verified from the women leaving the residence that Defendant did indeed reside at the St. Louis Park home, it is reasonable to assume that the agents would have sought a search warrant based entirely on the information known to them at that time.  In other words, there were independent bases on which the agents could have applied for the for the search warrant, and the evidence seized here is untainted by the initial warrantless entry.  See Segura v. United States, 468 U.S. 796 (1984).  Under these circumstances, the warrant was the product of independent sources, and the scrubs seized are admissible.

### C.    The Scrubs Were Properly Seized Under the Plain View Doctrine

Defendant claims that the evidence should be suppressed because the Search Warrant did not authorize the seizure of the medical scrubs that are the subject of this motion to suppress.  He argues that the agents exceeded the scope of the warrant by seizing the scrubs, which were not listed in the warrant.  He argues that the scrubs did not have any relationship to the items listed in the warrant and that the agents had no legal authority to seize the scrubs.  The Court concludes that the seizure of the scrubs was permissible pursuant to the plain view doctrine.

Generally, police may only seize items described in the search warrant, absent an exception to the warrant requirement.  United States v. Robbins, 21 F.3d 297, 300 (8th Cir. 1994).  One such exception is the plain view exception.  Under the plain view doctrine, officers may seize an item if they have a lawful right of access to the item seized and the object's incriminating nature is

immediately apparent.   Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citations omitted);

United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003).

  Whether the agents here were lawfully looking where the scrubs were found turns first on

whether the search warrant was supported by probable cause.   Illinois v. Gates, 462 U.S. 213, 236

(1983).   "Probable cause exists when, given the totality of the circumstances, a reasonable person

could believe there is a fair probability that contraband or evidence of a crime would be found in a

particular place."   United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).   A court does not

evaluate each piece of information independently, but rather considers all of the facts for their

cumulative meaning.   United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002).   The task of a court

issuing a search warrant is simply to make a practical, common sense decision whether, given all

the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons

supplying hearsay information, there is a fair probability that contraband or evidence of a crime will

be found in a particular place.   Gates, 462 U.S. at 238; see also United States v. Salter, 358 F.3d at

1080, 1084 (8th Cir. 2004).

  In reviewing the decision of the issuing court, this Court must ensure that the issuing court

had a substantial basis for concluding that probable cause existed.   United States v. Oropesa, 316

F.3d 762, 766 (8th Cir. 2003) citing Gates, 462 U.S. at 238-39.   Because reasonable minds may

differ on whether a particular search warrant affidavit establishes probable cause, the magistrate's

determination is accorded great deference.   U.S. v. Wajda, 810 F.2d 754, 760 (8th Cir. 1987) citing

United States v. Leon, 468 U.S. 897, 914 (1984).

  Although the warrant to search Defendant's St. Louis Park residence for certain items, was

supported by probable cause, the agent's request to search for items not described in the affidavit

-16-

demonstrates a shocking ignorance of the Fourth Amendment.  The Affidavit included information

from the FBI that Defendant was responsible for a robbery at the U.S. Bank in St. Louis Park that

occurred on June 25, 2005.  The affidavit also established that some one robbed the TCF Bank in

Fridley on June 27, 2005.  It also included information from the FBI and Hennepin County Social

Services that Defendant resided in St. Louis Park, and that two witnesses from the TCF robbery had

identified Defendant as the robber.  The modus operandi of both robberies were the same.  There

was probable cause to believe that evidence of both robberies could be found at the Defendant's St.

Louis Park residence.

Here, Defendant argues that the search warrant is invalid because the list of eleven items that

could be seized included nine items that had no relevance to the alleged robberies on June 25 and

27, and were not supported by probable cause in the Affidavit submitted in support of the search

warrant.[2]  The Government concedes that several items on the "list of items to be seized," i.e., the

black bandana with white stripes, white tennis shoes, fishing hat and dark sunglasses were not

mentioned in the affidavit.   On the other hand, the government contends there was probable cause

to search for a handgun, a black windbreaker, blue jeans, a grey t-shirt and U.S. currency.  At the

first hearing, Agent Otterson admitted that there was no mention of the nine items in the search

warrant application.[3]  At the second hearing, Agent Nielsen testified that she had intentionally

included items of clothing to be seized based on her suspicion that the Defendant had committed as

---

[2]

Attachment A to the Search Warrant, entitled "Items to Be Seized," includes:  "handguns, black windbreaker with white stripes, black bandana with white markings, blue jean shorts, white tennis shoes, dark sun glasses, dark colored bucket style fishing hat, grey tee shirt, jeans, U.S. currency, bait bills."  Govt. Ex. 4.

[3]

At the first hearing on August 24, 2005, the Government represented that the "list of items to be seized" was originally generated in an unrelated investigation and mistakenly attached to the search warrant application in this case.

many as six robberies in the preceding month.  She stated that she included the clothing worn in the previous suspected robberies, even though she did not include in her Affidavit facts that demonstrated she had probable cause to believe that Defendant had committed the other robberies, or that evidence from those robberies would be found at the St. Louis Park residence.

To the extent the warrant sought authority to search for items not described in the affidavit, the search warrant failed to comport with the probable cause and particularity requirements of the Fourth Amendment.  At the same time, affiant had probable cause to search for medical scrubs (worn by the robber of the TCF Bank as shown in the surveillance photo) but failed to seek authority to search for them.  In short, the warrant application, and the search warrant affiant sought here, demonstrate a shocking ignorance of what the Fourth Amendment requires with respect to probable cause.  A law enforcement agent who seeks a warrant to search a person's home, must establish probable cause to believe the particular evidence for which he/she is searching will be found in the place to be searched, and the warrant must describe with particularity the place to be searched and the items to be seized.

In ruling on a motion to suppress evidence, however, the Court is guided not by the ignorance of the government agents, but by the law.  Here, the affidavit set forth probable cause to believe that some of the evidence for which she was looking would be found in the place to be searched.  In particular the handgun and the clothing.  As the scrubs were found in plain view in a place in which lawful objects of the search might have been concealed, they are admissible.

Here, the agents had a lawful right of access to search the washing machine.  See United States v. Schmitz, 181 F.3d 981, 988 (8th Cir. 1999) (citation omitted) (a lawful search extends to

all areas and containers in which the object of the search may be found).  The warrant unlawfully listed some clothing items to be seized for which no probable cause was established.  For example, the affidavit described a black bandana with white stripes and a bucket style fishing hat.  On the other hand, the warrant also authorized the seizure of other clothing items as to which probable cause was established.  As this latter evidence could have been concealed in the basement, it was proper for the agents to search the washing machine in the basement as part of their execution of the warrant.

The incriminating nature of the scrubs was immediately apparent to the agents.  Agent Lawrence testified that he had reviewed the surveillance photos of one of the bank robberies earlier that day, and that the robber was pictured wearing scrubs during the robbery.  The incriminating nature of the scrubs in the washing machine was immediately apparent to the agents.  See United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (holding incriminating nature of items is immediately apparent if officer had probable cause to associate it with criminal activity).  The agents had lawful right of access to the washing machine and the incriminating nature of the scrubs was readily apparent.  The scrubs were properly seized pursuant to the plain view exception to the warrant requirement.  That the scrubs were not specifically listed for seizure by the warrant does not require that they be suppressed.

**D.      The Agents Did Not Unlawfully Search the Residence Before Obtaining a Warrant**

In his Memorandum submitted after the first evidentiary hearing, Defendant argued that the agents unlawfully searched his residence while waiting for another Agent to obtain a search warrant. See Def. Mem. p. 7.  He argued that Agent Otterson's testimony regarding the agents' conduct while they waited for the search warrant was vague.  He also submitted an Affidavit from Tamica Bazinet, an occupant of the residence who was present the afternoon of the search, in which she stated that the agents had searched the home before the warrant was obtained.

At the second hearing it became clear that the agents did not search the residence until they received a phone call from Agent Nielsen in which she informed them that she had obtained the warrant.  The issuing Magistrate signed the search warrant at 3:50p.m. on June 29.  At that time, Agent Nielsen faxed a copy of the warrant to Agent Applebaum.  She also radioed Agent Kaufman, who was present at the house, that she had obtained the warrant.  Upon receiving the phone call, the agents began searching the residence.  Despite Agent Nielsen's intention for Agent Applebaum to bring a copy of the search warrant to the residence with the search kit, no Agent testified that he or she had seen the warrant prior to the search.

Ms. Bazinet testified that the agents spent the afternoon waiting for the search warrant on the front porch and within the vicinity of the front door.  She stated that the agents began searching the residence at approximately 4:00p.m., that the search lasted approximately one hour, and that Agent Nielsen arrived at the home at approximately 5:00p.m.  Though she testified that she never saw the actual warrant on June 29, she stated that she saw Agent Nielsen present paperwork to her mother when she arrived.

The Court concludes that the agents did not unlawfully search the residence prior to

obtaining the search warrant.   Nothing in the Fourth Amendment or Federal Rule of Criminal Procedure 41 requires that the search warrant be physically present prior to commencing the search. United States v. Hepperle, 810 F.2d 836, 839 (8th Cir. 1986), citing Katz v. United States, 389 U.S. 347, 355 n. 16 (1967).   In Hepperle, the Eighth Circuit held that law enforcement officials are not constitutionally required to present a copy of the search warrant prior to commencing a search, so long as the previously issued warrant is presented before the officers vacate the premises.   Id.   Here, Agent Nielsen presented the warrant after the search was completed, but before the officers vacated the premises.   As such, no constitutional violation occurred, and the evidence will not be suppressed because the agents commenced the search before the actual physical arrival of the warrant.

In sum, Defendant's Motions to suppress the identifications and evidence should be denied. Though the photo spread was unduly suggestive, the totality of the circumstances indicates that the identifications of Defendant were nonetheless reliable.   The unlawful entry and arrest of Defendant did not taint the later search of Defendant's residence because the search warrant was the product of independent sources of information rather than information obtained during the illegal entry.   The search warrant was supported by probable cause.   The agents properly seized the scrubs under the plain view doctrine.   The search for evidence did not begin until after the search warrant was issued. As Agent Nielsen presented the search warrant before the officers vacated the residence, that the search began earlier does not entitle Defendant to suppression of the evidence.   The Court concludes that the identifications and the scrubs are admissible.

### III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that

Defendant's Motions to Suppress Witness Identifications [#18] and to Suppress Evidence as a Result

of Search and Seizure [#31] should be **DENIED.**


DATED: October 25, 2005                      s/ *Franklin L. Noel*
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **November 10, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **November 10, 2005,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.